FILED

2020 Dec-02  PM 12:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA DIANE YELLING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-01607-SGC |
| | ) | |
| ST. VINCENT'S HEALTH | ) | |
| SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>[1]

Plaintiff Cynthia Diane Yelling initiated this matter by filing a *pro se* complaint, alleging employment discrimination by her former employer on the basis of race, age, and disability.  (Doc. 1).  Counsel subsequently appeared on Yelling's behalf and filed an amended complaint, asserting claims for race-based discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981.  (Doc. 9).  Presently pending is the motion for summary judgment as to all claims, filed by Defendant St. Vincent's Health System.  (Doc. 32).  The motion is fully briefed and ripe for adjudication.  (Docs. 33-34, 39-40, 43).  As explained below, the motion is due to be granted in its entirety.

---

[1] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 18).

## I.     SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id*. at 249.

## II.    SUMMARY JUDGMENT FACTS[2]

Yelling, who is Black, obtained her nursing degree from Lawson State Community College; she has been a licensed registered nurse ("RN") for twenty-five years.  (Doc. 40 at 6).  In 2010, Yelling became a nurse at St. Vincent's Hospital, initially working as a "pool" or "floating" nurse.  (*Id.*).  After six months, the nurse manager on the Critical Decision Unit ("CDU"), Casi Dubose, hired Yelling to a permanent position.  (*Id.*).  The supervisory structure on the CDU ascended from: (1) RNs; (2) charge nurse; (3) patient care supervisor; (4) nurse manager; to (5) administrative nursing director.  (*Id.*).  During the relevant time the CDU was staffed as follows: (1) the charge nurses were Jimmy Wilhite and Jennifer Laroe; (2) the patient care supervisor was Crystal Haynes; (3) the nurse manager was Casi Dubose; and (4) the administrative nursing director was Chuck Lacey.  (*Id.* at 6-7).  Kimberley Parrish worked as the "House Supervisor," who was in charge of hospital operations during the weekend day shift.  All of these supervisors are White except for Chuck Lacey, who is Black.  (Doc. 33 at 6).

Initially, Yelling worked a weeknight shift in the CDU, transferring to a weekend night shift in 2013.  (Doc. 33 at 6).  In September 2013, Yelling began

---

[2] The facts set forth below are cast in the light most favorable to Yelling.  However, these are "facts" for summary judgment purposes only.

working a weekend day shift; she worked this schedule until her termination.  (*Id.*; Doc. 34-10 at 2).  Although Yelling did not receive an annual evaluation every year she worked at St. Vincent's, the evaluations she did receive reflected she met expectations.  (Doc. 40 at 7).  Yelling did not receive any negative performance reviews or discipline until September 2015.  (*Id.*).  Yelling contends Dubose had a "quota" under which she would only hire one Black CDU nurse per shift.  (Doc. 40 at 7, 19).  In support of this assertion, Yelling relies on a June 13, 2017 rebuttal letter she wrote in support of her EEOC charges, as well as Dubose's deposition testimony that she could not recall whether there was more than one Black CDU nurse per shift.  (*Id.* at 7).  However, Plaintiff testified that at some point Dubose hired a second Black nurse to work the CDU night shift.  (Doc. 34-1 at 20).

Yelling contends her work environment changed in 2015.  (Doc. 40 at 8).  In March 2015, President Obama visited Lawson State, Yelling's alma mater and a school she describes as a "predominantly Black college."  (*Id.* at 6, 8).  In response, Jimmy Wilhite asked why President Obama was visiting and whether he was "handing out food stamps."  (*Id.* at 8).  Yelling was offended and believed Wilhite's statement was racist due to Lawson State's "predominantly Black" status and some people's belief that food stamp recipients tend to be minorities.  (*Id.*).

Yelling alleges coworkers also made racist comments during 2015 in conversations at the nurses' station, including: (1) Sandy Sheffield, a White pool

4

nurse, stated "Michelle Obama looks like a monkey" and regularly referred to Black patients as drug seekers, "welfare queens," and "crack heads"; (2) Linda Powell and Tiffany Hardy repeatedly said President Obama should "go back to Africa" and made "derogatory comments about minorities in the news"; (3) Tiffany Hardy also referred to Michelle Obama as a monkey and referred to Black patients—but not White patients—as "ghetto fabulous," or insinuated they were welfare recipients; and (4) Jennifer Laroe, as well as coworkers Tonya Larimore and Robin Calvert, bragged about being proud rednecks who flew the confederate flag. (Doc. 40 at 8-9; Doc. 34-1 at 14).

Yelling contemporaneously reported to two supervisors—Dubose and Lacey—Wilhite's statement regarding President Obama handing out food stamps at Lawson State. (Doc. 34-1 at 12). It does not appear this complaint prompted any response. Yelling also verbally reported her co-workers' racist comments to Wilhite and Laroe, as well as to Dubose. (*Id.* at 14-16). Yelling's supervisors either brushed off her complaints or did not respond. (*Id.* at 15).

When the charge nurse was unavailable to work a regularly scheduled shift, Dubose would assign another nurse to the role of charge nurse. (*See* Doc. 40 at 9). The charge nurse, whether permanent or acting, was paid an extra dollar per hour. (*Id.*). Yelling testified, prior to her transfer to weekend-only shifts in 2013, Dubose would not select her or other Black nurses to serve as acting charge nurse.

5

(Doc. 34-1 at 20).   However, Yelling testified there were occasions when she worked as the acting charge nurse.  (Doc. 34-1 at 21).

On June 14, 2015, Laroe called Kimberly Parrish to the CDU, stating Yelling had been behaving inappropriately towards a Black patient care technician ("PCT").  (Doc. 34-11 at 4-5).  The PCT complained Yelling was disrespectful and would bark orders at her, which Laroe confirmed.  (*Id.*).  After spending an hour and a half on the CDU speaking to Yelling and the PCT, Parrish believed the problem was resolved; she told Yelling she needed to mind her tone when addressing coworkers.  (*Id.* at 6).  Yelling testified she complained to Parrish about her coworkers' racist comments and discriminatory work assignments during this meeting.  (Doc. 34-1 at 22, 64; *see* Doc. 40 at 9-10).  Parrish responded that the CDU was "Casi's unit."  (Doc. 40 at 10).  Yelling followed up with a call to Dubose on June 15, 2015; Dubose never responded.  (*Id.*).

On June 21, 2015, a CDU nurse called Parrish at approximately 9:10 a.m., saying Yelling had left the floor and, upon return, appeared to be under the influence of some manner of intoxicant.  (Doc. 34-11 at 3).[3]  Other CDU nurses then called Parrish to report their suspicions that Yelling was under the influence. (*Id.*).  Specifically, these witnesses stated Yelling's gait was unsteady, her eyes were partially closed, and she seemed lethargic.  (*Id.*).  Parrish called Kristin

---

[3] This was several months after Parrish received a complaint from a patient's family member when she found Yelling's personal prescription bottle in the patient's room.  (Doc. 34-11 at 3).

Costanzo, a member of St. Vincent's Human Resources ("HR") Department, for guidance on how to proceed. (*Id.*). At 11:00 a.m., the CDU secretary called Parrish to report Yelling was sleeping at her desk. (*Id.*). Shortly thereafter, Costanzo returned Parrish's call and told her to fill out a "Reasonable Suspicion Checklist"—a form St. Vincent's uses when an employee is suspected of being under the influence at work. (*Id.* at 4; *see* Doc. 39-3). When Parrish went to the CDU, she observed Yelling sitting with her head down on her desk. (Doc. 34-11 at 4). Yelling was not drug tested until approximately 12:00 p.m.; she continued to perform her nursing duties until then. (*See* Doc. 40 at 10). Yelling was sent home at 1:15 p.m. that day and was suspended for the rest of that weekend, as well as the following weekend, pending results of the drug test. (Doc. 39-3 at 2; 34-1 at 48). Yelling's drug test did not reveal the presence of intoxicants; at some point she was paid for the work she missed as a result of her suspension. (Doc. 34-1 at 48; *see* Doc. 33 at 7).

When Yelling returned from her suspension, she met with HR's Costanzo, stating her belief that the drug testing and suspension was retaliation for the June 14, 2015 incident involving the PCT. Yelling also testified the Hospital did not drug test Holly Sykes, a White charge nurse who fell out of her chair at work. (Doc. 40 at 10). However, Yelling acknowledged she never reported this event or her observation of Sykes's dilated pupils to supervisors or HR. (Doc. 34-1 at 48).

On June 26, 2015, Yelling again asked to speak with HR about harassment.  In a meeting with Costanzo, Yelling complained about the culture of the CDU, which Costanzo understood to be a complaint of racial discrimination.  (*See* Doc. 40 at 10; Doc. 34-7 at 19; Doc. 34-9 at 3).   Yelling also told Costanzo about her supervisors' failures to address her previous complaints regarding co-workers' racist comments.  (Doc. 40 at 11).   Costanzo testified she did not remember following up with Yelling regarding her complaint.  (Doc. 40 at 11; Doc. 34-7 at 20).

Before Yelling returned to work following her drug test suspension, Casi Dubose contacted other CDU staff on the weekend day shift; Dubose discussed how they should interact with Yelling, and she told Laroe to "document all issues going forward."  (Doc. 34-6 at 17-18; *see* Doc. 39-4).[4]  Dubose also reiterated to these employees—but not Yelling—the importance of wearing the tracking system monitors the Hospital uses to determine the location of its employees and their access to patient rooms.  (Doc. 39-4; *see* Doc. 40 at 11; Doc. 34-1 at 35).  The trackers are battery-operated badges that create a log of CDU staff's location as they move throughout the unit; they do not create a log when an employee is stationary.  (Doc. 43 at 8).  The badges only accurately tracked movements when the batteries were charged and the employee wore the device.  (Doc. 34-5 at 10).

---

[4] Dubose testified her instruction to document issues pertained to any issues with anyone on the CDU, not just Yelling.  (Doc. 34-6 at 18).

The record indicates Dubose and Laroe were aware the tracker did not always accurately reveal Yelling's location.  (*Id.*; Doc. 34-6 at 32).

When Yelling returned from her suspension, other employees stated Dubose would fire her.  (Doc. 34-1 at 79).  Meanwhile, CDU staff documented their complaints regarding Yelling's job performance and forwarded them to Dubose; in turn, Dubose forwarded the complaints to HR.  (Docs. 39-5, 39-6; *see* Doc. 40 at 12).  Some of these complaints were seemingly trivial, including that Yelling sprayed "smell good spray" in a patient's room and moved tables between rooms.  (Doc. 39-5 at 8).  Lacey acknowledged the complaint about moving the tables would not normally be forwarded to HR.  (Doc. 39-4 at 23).  Other complaints concerned Yelling's administration of medical care and/or complaints regarding her demeanor during interactions with other CDU staff.  (*See generally* Doc. 39-5).

On July 26, 2015, a patient complained Yelling did not provide appropriate care unless a charge nurse or doctor was present and that Yelling's prayers made her uncomfortable.  (Doc. 34-10 at 3).  Haynes, Dubose, and Lacey met with Yelling in August 2015, explaining the need to respect patients' requests and the importance of following orders.  (Doc. 34-10 at 3; *see* Doc. 33 at 8).  This was a non-disciplinary meeting.  (Doc. 34-10 at 3).  In apparent preparation for this meeting, Lacey, Dubose, Haynes, and Costanzo met on August 6, 2015, to discuss Yelling and the July 26, 2015 patient complaint.  (Doc. 34-7 at 66; *see id*. at 22).

Costanzo's notes from this meeting reflect the group discussed that Yelling's charting on July 26, 2015, reflected more in-person interactions with patients than shown by her tracking report. (*Id.* at 66). Yelling was not counseled or disciplined for the tracker issue; no one mentioned it to her. (*Id.*).

On October 8, 2015, Dubose, Haynes, and Lacey met with Yelling and issued a "Coaching Agreement," which is the first step in St. Vincent's four-step disciplinary process. (Doc. 34-1 at 90-91; *see* Doc. 33 at 8). The Coaching Agreement noted the following delays in providing patient care and/or failures to follow doctors' orders: (1) disconnecting intravenous ("IV") fluids on July 26, 2015, reconnecting them when a doctor arrived on the floor; (2) disconnecting IV fluids and failing to administer medication on September 26, 2015; (3) failing to timely administer a blood transfusion on September 27, 2015; and (4) failing to properly administer medications on October 4, 2015. (Doc. 34-1 at 90-91). The Coaching Agreement also directed Yelling to speak with each of her colleagues to seek how she could improve her communication with them. (*Id.* at 91). The Coaching Agreement was not accompanied by any suspension or loss of pay. (*Id.* at 25). Yelling signed the Coaching Agreement but disagreed with its findings; she notes a White RN who had been fired by the patient who made the July 26, 2015 complaint was not disciplined. (*Id.*; *see* Doc. 40 at 12).

On November 22, 2015, Yelling was unable to find lab slips during her shift; she concluded her coworkers had hidden them.  (Doc. 40 at 13).  Plaintiff testified that while discussing this issue with Laroe, a White CDU nurse, Robin Calvert, interjected herself into the conversation and raised her voice in a loud and hostile manner.  (Doc. 34-1 at 29; *see* Doc. 40 at 13).  In response, Yelling said "[A]s a child of God, when you go against another child of God or you do wicked things against them, you are bringing curses upon you and your children and your children's children."  (Doc. 34-1 at 28).  After learning of this incident, Parrish suspended Yelling without pay for the remainder of the shift for calling her coworkers wicked.  (*Id.*; Doc. 34-11 at 7; *see* Doc. 33 at 10; Doc. 40 at 13).  After investigating the matter, Dubose, Lacey, and Haynes decided to discipline both Calvert and Yelling.  (Doc. 34-10 at 4).  Because Calvert had not been disciplined before, she received a Coaching Agreement, the first step in the discipline process. (*Id.*; Doc. 34-6 at 47).[5]  Because Yelling had already received a Coaching Agreement, she received a "Verbal Agreement," the second step in the disciplinary process.  (Doc. 34-10 at 4; Doc. 34-1 at 92).  In response to the disciplinary action, Yelling complained to Lacey about racial discrimination in the CDU.  (Doc. 34-4 at 32-33).

---

[5] The Coaching Agreement was not delivered to Calvert until December 2, 2015.  (Doc. 34-6 at 47).  The unrebutted evidence shows the delay was occasioned by Calvert's absence from work during the Thanksgiving holiday.  (Doc. 34-10 at 4).

On November 23, 2015—the day after being suspended—Yelling filed her first charge of discrimination with the EEOC.  (Doc. 34-1 at 123-124).  On December 12, 2015, Yelling used the Hospital's online complaint system to report the CDU secretary, Tiffany Hardy—one of the CDU staff members who made derogatory comments about the Obamas and Black patients—cursed at her, saying "I don't give a sh** what you do."  (*Id.* at 40, 95-96).  Yelling reported this as an instance of workplace violence.  (*Id.* at 95).  However, while Yelling's internal complaint form stated there was a hostile work environment on the CDU, it did not mention any form of discrimination.  (*Id.* at 96).

On January 10, 2016, Yelling filled out a second online complaint; this one concerned a verbal interaction with Stephanie Edwards, another CDU nurse.  (Doc. 34-1 at 97-99).  The incident occurred when Yelling was taking medical history from a patient's family member, which Edwards mistook as her socializing.  (*Id.* at 98-99).  Edwards, who was upset because she had just completed care for one of Yelling's other patients, raised her voice and said Yelling was the "problem on th[e CDU]."  (*Id.* at 99).  Yelling reported this as an instance of workplace violence; as with the first internal complaint, Yelling described the CDU as a hostile work environment but did not mention the race of the participants or allege any form of discrimination.  (*Id.* at 97-99).  Yelling testified she did not know if Edwards's harsh tone was motivated by her race because they did not work together

12

frequently and she had never heard her make racist statements in the past.  (*Id.* at 37-38).  Neither Hardy or Edwards were disciplined.  (*See* Doc. 40 at 14).

When reviewing Yelling's internal complaint regarding the January 10, 2016 interaction with Edwards, Haynes discovered the verbal exchange began because Edwards had been providing care to one of Yelling's patients, located in room 610.  (Doc. 34-10 at 4; *see* Doc. 34-9 at 4).   In reviewing the chart for that patient, Haynes saw that the heart rhythm monitors indicated the patient needed attention at 6:23 p.m.  (Doc. 34-10 at 4).  Yelling charted that she physically checked on the patient, performed a test, and communicated with the patient at 6:19 p.m.  (*Id.* at 4-5).  However, review of the tracker data reflected Yelling did not enter room 610 at any point after 4:01 p.m.  (*Id.* at 5).  Edwards' tracker data showed she was in room 610 for several minutes at approximately 6:35 p.m.  (Doc. 34-8 at 16).  Additionally, Haynes spoke with seven CDU staff members regarding the situation; six of the seven stated Yelling never left the nurses' station to go to room 610.  (Doc. 34-10 at 5).

When Dubose, Lacey, and Haynes discussed the situation with Yelling, she responded that her tracker must not have been working.  (Doc. 34-10 at 5).  These CDU supervisors concluded Yelling had falsified medical records and elevated the matter to HR.  (*Id.*).   Caitlin Griffin, who works in HR, reviewed the documentation provided by the CDU supervisors and agreed Yelling had falsified

medical documentation.  (Doc. 34-9 at 4).  Griffin agreed with CDU leadership that Yelling should be terminated.  (*Id.*; *see id.* at 7).  Throughout the process, Yelling denied she falsified any medical records, insisting on the accuracy of her charting.  (*See* Doc. 40 at 15).

Yelling was terminated on February 2, 2016.  (Doc. 34-9 at 7).  The termination letter noted the discrepancies between Yelling's charting and the tracker report.  (*Id.*).  Yelling filed a second charge of discrimination with the EEOC on the day of her termination, adding a charge of retaliation.  (Doc. 34-1 at 125).[6]  Following Yelling's termination, the Hospital replaced her with a White nurse.  (Doc. 39-14 at 4).

## III.   DISCUSSION

As noted above, Yelling asserts claims for racial discrimination, racially hostile work environment, and retaliation.  Before addressing these claims in turn, the court notes that—as asserted by Defendant—any events which occurred prior to May 27, 2015, are untimely for purposes of this litigation.  (*See* Doc. 33 at 19).  Regarding Title VII claims, an Alabama plaintiff must file a charge of discrimination with the EEOC within 180 days of the offending conduct.

---

[6] Although both of Yelling's EEOC charges alleged a number of types of discrimination, the claims presented in this matter are for race discrimination, racially hostile work environment, and retaliation under Title VII and § 1981.  (Doc. 9; Doc. 34-1 at 50).  The standards applicable to claims under Title VII and § 1981 are identical when, as here, they rely on the same facts.  *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (court need not separately discuss Title VII and § 1981 claims); *Pears v. Mobile Cty.*, 645 F. Supp. 2d 1062 (S.D. Ala. 2009).

*Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005). Here, Yelling filed her first EEOC charge on November 23, 2015, which was 180 days after May 27, 2015. Accordingly, any Title VII claims based on conduct that occurred prior to May 27, 2015, are untimely.[7] Plaintiff appears to tacitly concede this point by expressly focusing her arguments on events occurring in or after June 2015. (*See* Doc. 40 at 19, n.4).

## A.   **Hostile Work Environment**

Title VII prohibits employers from discriminating in the workplace on the basis of a person's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Title VII prohibits a hostile work environment in which "a series of separate acts [] collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117 (2002). To establish a hostile work environment claim, a plaintiff must show: (1) membership in a protected group; (2) unwelcome harassment; (3) harassment based on a protected characteristic of the plaintiff; (4) harassment sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer's responsibility—either directly or

---

[7] Meanwhile, Yelling's § 1981 claims are subject to a two-year statute of limitations. *Edwards v. Nat'l Vision, Inc.*, 658 F. App'x 854, 860 (11th Cir. 2014). Here, Yelling filed her initial complaint on September 19, 2017. (Doc. 1). Accordingly, any § 1981 claims based on conduct prior to September 19, 2015, are time-barred. Because her Title VII and § 1981 claims are based on the same facts, the court will apply the earlier limitation period—May 27, 2015—applicable to Yelling's Title VII claims.

vicariously—for the discriminatory environment.  *McCann v. Tillman,* 526 F.3d 1370, 1378 (11th Cir. 2008).

Here, in support of her hostile work environment claim, Yelling principally relies on her testimony regarding her coworkers' racist comments about the Obamas and Black patients, as well as referring to themselves as rednecks who flew the confederate flag.  (Doc. 40 at 19-20).[8]  Specifically, Yelling testified: (1) Sandy Sheffield, a White pool nurse, stated, "Michelle Obama looks like a monkey" and regularly referred to Black patients as "welfare queens" and "crack heads" who were only at the hospital seeking drugs; (2) Linda Powell and Tiffany Hardy repeatedly said President Obama should "go back to Africa"; (3) Tiffany Hardy also referred to Michelle Obama as a monkey and referred to Black patients—but not White patients—as "ghetto fabulous" or insinuated they were welfare recipients; and (4) Jennifer Laroe, as well as coworkers Tonya Larimore and Robin Calvert, bragged about being rednecks who flew the confederate flag.[9]

---

[8] Yelling also relies on her allegation that Dubose had a "quota" under which she would only hire one Black CDU nurse per shift.  (Doc. 40 at 7, 19).  While Yelling testified that Dubose hired a second Black nurse to work the CDU night shift at some point, "a plaintiff's testimony cannot be discounted on summary judgment unless it is . . .  blatantly inconsistent . . ." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013); *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) ("Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility" to be resolved by the fact finder).  In any event, this evidence goes more to the discrimination claim than to hostile work environment.

[9] Yelling also relies on Jimmy Wilhite's question, in response to President Obama's visit to Lawson State, whether he was "handing out food stamps."  (Doc. 40 at 20).  Wilhite made this

16

Regarding the third requirement, some of the comments Yelling relies upon were based on her race; others were not. Specifically, the statements Sheffield, Powell, and Hardy made concerning the President and First Lady Obama were racist. *Smelter v. S. Home Care Servs., Inc.,* 904 F.3d 1276, 1282 (11th Cir. 2018) (coworker's statements that "President Obama's 'big ears' made him 'look like a monkey'" and that she wished she could "send them all back to Africa" were racist remarks) (alteration incorporated); *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) ("The use of the term 'monkey' and other similar words have been part of actionable racial harassment claims across the country."). The same is true regarding these nurses' statements referring to Black patients as drug-seekers, welfare recipients, "crack heads," or "ghetto fabulous." *Smelter*, 904 F.3d at 1286 (coworker's statement that "[B]lack women had babies on welfare" constituted a racist remark) (alteration incorporated). These race-based statements satisfy the third requirement for hostile work environment claims.

Conversely, the statements Yelling attributes to Tonya Larimore, Jennifer Laroe, and Robin Calvert—that they were rednecks who proudly flew the confederate flag—are not racially motivated in the circumstances presented here. First, although the plaintiff has not pointed to a case on point—and the undersigned has not located any intra-circuit opinions addressing the question—

---

racist statement in March 2015, which was more than 180 days prior to Yelling's first EEOC charge. Accordingly, any claim based on Wilhite's comment is time-barred.

there is nothing inherently racial about someone referring to themself as a redneck. *See Bishop v. Tyson Foods, Inc.*, 660 F. Supp. 2d 1004, 1020 (W.D. Ark. 2009); *Lawton v. Sunoco, Inc.,* No. 01-2784, 2002 WL 1585582, *8 (E.D. Pa. July 17, 2002).

Regarding these employees' statements that they flew the confederate flag, the Eleventh Circuit has noted "it is not an irrational inference that one who displays the confederate flag may harbor racial bias against African–Americans." *Jones*, 683 F.3d at 1303.  However, the claims in *Jones* arose in the context of multiple employees at work while wearing clothing bearing confederate insignia. *See id.* at 1300 (quoting decisions noting "the *display of confederate flags in the workplace* may support a hostile work environment claim" and "*images* of the Confederate flag" created a jury question regarding hostile work environment) (emphasis added).  Here, Yelling does not suggest any CDU employee ever displayed confederate emblems at work.  Instead, Yelling claims Larimore, Laroe, and Calvert merely stated they flew the confederate flag.  (Doc. 40 at 9).

Additionally, Yelling testified Laroe and Larimore did not make any other race-based comments.  (Doc. 34-1 at 19) ("No, I don't recall Jennifer [Laroe] making race-related comments about [B]lacks.  Jennifer was the one that tried to keep the peace."); (*Id.* at 18) ("Correct, [Larimore] just made the redneck and those type of comments.").  While Yelling testified Calvert had a negative opinion of the

18

Obamas, she did not attribute any statements to Calvert—unlike the statements by Sheffield, Powell, and Hardy—indicating her negative opinion of the first family was based on their race. (*Id.* at 18). As this court has previously noted: "There is nothing inherently discriminatory about expressing political views or negative opinions of politicians." *Coleman v. City of Irondale*, No. 15-1019-SGC, 2017 WL 4099881 at *11 (N.D. Ala. *entered* Sept. 15, 2017). For the foregoing reasons, the comments attributed to Laroe, Larimore, and Calvert fail the third requirement for hostile work environment because they were not based on Yelling's race.[10]

As to Sheffield's, Powell's, and Hardy's racist comments described above, determining whether Yelling satisfies the fourth requirement—severity or pervasiveness—involves objective and subjective components. *McCann*, 526 F.3d at 1378. Obviously, Yelling was offended by these comments, satisfying the subjective component. Regarding the objective component, courts examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted). A hostile work environment is one that "is permeated with discriminatory intimidation, ridicule, and insult, that is

---

[10] Moreover, even if these comments were construed as race-based, for the same reasons explained below, they would not qualify as sufficiently severe to sustain a hostile work environment claim.

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rojas v. Fla.,* 285 F.3d 1339, 1344 (11th Cir. 2002).

Here, regarding the frequency of the overtly racist statements, Yelling testified Powell, Hardy, and Sheffield "always" made "racially insensitive comments." (Doc. 34-1 at 15).  However, of the three, Sheffield was the only one with whom Yelling regularly worked on the weekend day shift—the only temporally relevant position Yelling held.   (Doc. 34-1 at 14).[11]   Moreover, regardless of frequency, the comments were not particularly severe.  The offensive comments concerning the Obamas and Black CDU patients were directed at third parties—not at Yelling.  *Smelter*, 904 F.3d at 1286; *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1250, 1251-57 (11th Cir. 2014) (differentiating between employees who merely overheard coworkers use the "N-word" and employees to whom the racial slur was directed).[12]   Yelling further testified she never heard any Hospital staff utter any offensive racial epithets not already discussed.  (Doc. 34-1 at 12).

Similarly, none of the comments Yelling describes—no matter how offensive, boorish, and stupid—were physically threatening or humiliating.

---

[11] Powell worked the weeknight shift.  (Doc. 34-1 at 14).  Hardy did not work every weekend, only doing so when her "weekend rotation came around."  (*Id.*).

[12] Yelling testified Sheffield was the only CDU employee who ever directly referenced Yelling's race.  (Doc. 34-1 at 17).  Even then, Yelling testified Sheffield's reference to her race was limited to comments about her hairstyle; Yelling was not offended by these comments.  (*Id.*).  Accordingly, Sheffield's comments about her hairstyle do not satisfy the subjective component.

Rather, these comments—about third-parties unrelated to Yelling—constitute offensive utterances. *See Buckhanon v. Huff & Assocs. Const. Co.*, 506 F. Supp. 2d 758, 966-67 (M.D. Ala. 2007) (court cannot assume offensive utterance "automatically denotes humiliation and threat"). Additionally, it does not appear these comments significantly interfered with Yelling's job performance. The comments about which she complains occurred during conversations at the nurses' station. Due to their responsibilities, it was unusual for all of the nurses to be at the nurses' station at the same time. Additionally, Yelling testified she spent most of her time at work caring for patients, away from the nurses' station. (Doc. 34-1 at 19).

In support of her hostile work environment claim, Yelling relies exclusively on *Smelter*. (Doc. 40 at 20-21). It is true some of the racist statements here mirror those the Eleventh Circuit found sufficient to constitute a hostile work environment in *Smelter*. 904 F.3d at 1286 (statements included: (1) comparing President Obama to a monkey; (2) Black women had babies on welfare; and (3) a desire to send Black people "back to Africa"). However, the circumstances presented in *Smelter* are different than those presented here in two crucial respects. First, in *Smelter*—unlike here—racist comments were directed at the plaintiff. *Id.* (coworker stated plaintiff resembled a "mixed monkey" from *Planet of the Apes*). Additionally, the racist statements in *Smelter* culminated in a much more severe

incident in which a coworker called her a "dumb black n***er" to insult her during a heated argument.  *Id.*  Due to these factual differences, Yelling's reliance on *Smelter* is misplaced.  In light of the conclusion Yelling cannot show severe or pervasive discrimination, it is not necessary to address the fifth requirement—St. Vincent's knowledge.

For the foregoing reasons, Yelling has not presented sufficient evidence to show her coworkers' racist comments were sufficiently severe or pervasive to constitute a hostile work environment.  Accordingly, there is no genuine issue of material fact, and St. Vincent's is entitled to judgment as a matter of law as to Yelling's claim for hostile work environment.

### B.    <u>Racial Discrimination</u>

The court begins the analysis of Yelling's claim for racial discrimination, which is based on circumstantial evidence, under the familiar *McDonnell Douglas* burden-shifting framework.[13]   Under *McDonnell Douglas*, once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision.  *E.g. Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993).  This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509

---

[13] This claim can also survive if Yelling presents "enough circumstantial evidence to raise a reasonable inference of intentional discrimination."  *Hamilton v. Southland Christian Sch., Inc.,* 680 F.3d 1316, 1320 (11th Cir. 2012).

(1993), and has been characterized as "exceedingly light," *Perryman v. Johnson Prods. Co*., 698 F.2d 1138, 1142 (11th Cir. 1983).   As long as the employer articulates a "clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production.   *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

After an employer articulates one or more legitimate, nondiscriminatory reasons for the employment action, the plaintiff must show the proffered reason was pretext for illegal discrimination.   *Chapman v. AI Transp.,* 229 F.3d 1012, 1025 (11th Cir. 2000).   If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it."   *Id.* at 1030.   To demonstrate pretext, the plaintiff must show the proffered reason was false and that discrimination was the real reason for the employer's action.   *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

To establish her *prima facie* case, Yelling must show: (1) membership in a protected class; (2) qualification for her position; (3) an adverse employment action; and (4) replacement by a person outside her protected class or less favorable treatment than a similarly-situated individual outside her protected class. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).   Here, Yelling clearly satisfies the first two requirements; the parties disagree as to the other two.

Yelling identifies four adverse employment actions: (1) the drug test and suspension; (2) her placement in progressive discipline; (3) the denial of the opportunity to work as a fill-in charge nurse; and (4) her termination. (Doc. 40 at 25-26). The parties agree Yelling's termination was an adverse employment action; they disagree as to the other three incidents. (Doc. 33 at 20-22; Doc. 43 at 5, n.1). One of these actions—denial of the opportunity to work as a fill-in charge nurse—can be resolved easily because it is time-barred. Yelling testified she was denied the opportunity to work as a relief charge nurse because of her race. (Doc. 34-1 at 20). Specifically, she contends Dubose would not ask her—or other Black nurses—to fill-in as charge nurse during the time she worked weekday nights, prior to her transition to weekend shifts. (*Id.*). Because Yelling transferred to working weekend shifts in 2013—more than a year before she filed her first EEOC charge—her claims regarding the fill-in charge nurse position are time-barred.[14]

In order to qualify as an adverse employment action, "conduct falling short of an ultimate employment decision must, in some substantial way, 'alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee.'" *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (alterations incorporated) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.

---

[14] Regardless, Yelling testified there were occasions when she did work as the fill-in charge nurse. (Doc. 34-1 at 21).

2000)).  St. Vincent's placement of Yelling in the progressive discipline program does not constitute an adverse employment action for purposes of her discrimination claim.  "The reprimand of an employee does not constitute an adverse employment action where the employee suffers no tangible harm as a result." *Summerlin v. M&H Valve. Co.,* 167 F. App'x 93, 97 (11th Cir. 2006). Here, Yelling's placement in the progressive discipline process did not result in any tangible harm to her and, thus, does not qualify as an adverse employment action.

Likewise, merely being subjected to a drug test does not constitute an adverse employment action.  *McQueen v. Ala. Dep't of Transp.*, 769 F. App'x 816, 824 (11th Cir. 2019) (in the context of a retaliation claim, plaintiff's "drug test did not constitute an adverse employment action because he passed the test and did not suffer any tangible harm as a result"); *Watters v. Metals*, No. 14-0483-TMP, 2016 WL 1243758, at *5 (N.D. Ala. *entered* Mar. 30, 2016) (plaintiff "cannot meet the *McDonnell Douglas* factors for supporting a Title VII claim because the drug test itself was not an adverse employment action").  Accordingly, to the extent Yelling claims the drug test itself was an adverse employment action, her argument fails.

Yelling contends her suspension following the drug test renders it an adverse employment action.  (Doc. 40 at 25).  Yelling was suspended from the day of the test through the following weekend.  Yelling contends that, although she was

eventually paid for the shifts she missed due to the suspension, she was deprived of the time value of the money until her pay was reinstated.   (Doc. 40 at 25). Yelling's argument in this regard relies exclusively on *Crawford*.  In *Crawford,* the plaintiff was initially denied a four percent pay increase, although the pay increase was awarded retroactively a year later.   529 F.3d at 973.   Under these circumstances, the Eleventh Circuit found the plaintiff had sufficiently shown the belated pay increase amounted to an adverse employment action—although she ultimately received the raise, she was deprived of the use or value of that money for an entire year.  *Id.*

Here, Yelling—who bears the burden of establishing her *prima facie* case— does not point to any evidence showing her pay for the shifts spanning the suspension was delayed at all.  Yelling testified St. Vincent's paid her "eventually" but also stated she did not lose any pay as a result of the drug test suspension. (Doc. 34-1 at 48).  Even if Yelling's ambiguous testimony on the matter could raise the inference she was temporarily deprived of pay, her suspension spanned two and a half shifts.  (*Id.*).  The time value of two and a half shifts of wages represents a *de minimis* injury, not the "*serious and material* change in the terms, conditions, or privileges of employment" required to show an adverse employment action.  *Watters*, 2016 WL 1243758 at *5 (granting summary judgment for failure

to show adverse employment action because three-day suspension without pay— pay not retroactively awarded—was *de minimis*).

For the foregoing reasons, Yelling's termination was the only adverse employment action that will be analyzed with regard to her discrimination claim. Because Yelling's replacement was White, she has satisfied her *prima facie* burden as to her termination without resorting to comparator evidence.  *See Mitchell v. Mercedes-Benz U.S. Intern., Inc.*, No. 13-1708-SGC, 2015 WL 1310721 (N.D. Ala. Mar. 24, 2015).  In response, St. Vincent's contends it terminated Yelling for falsifying medical records on January 10, 2016, by indicating she had visited room 610 when tracking records and witnesses stated she had not done so.  Costanzo testified termination—in lieu of proceeding to the next step of the disciplinary process—was proper because falsification of medical records results in "automatic termination."  (Doc. 34-7 at 33).  This satisfies St. Vincent's exceedingly light burden to show a legitimate nondiscriminatory reason for Yelling's termination.

To demonstrate St. Vincent's proffered reason was pretextual, Yelling must show "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions . . . that a reasonable factfinder could find them unworthy of credence."  *Springer v. Convergys Customer Mgmt. Grp., Inc.,* 509 F.3d 1344, 1348 (11th Cir. 2007).  To show pretext, Yelling argues her tracking device was unreliable and that the tracking report for the day in question was inaccurate.

27

(Doc. 40 at 33-34).    However, St. Vincent's investigation into Yelling's movements on January 10, 2016, was not limited to blind adherence to information gathered from her tracking device.   St. Vincent's also interviewed seven CDU employees, six of whom confirmed that she did not enter room 610.   Accordingly, Yelling's pretext arguments focusing on the unreliability of her tracking device fail.[15]   Moreover, nothing suggests St. Vincent's decision to terminate Yelling was actually motivated by discriminatory animus.   *Brooks*, 446 F.3d at 1163.

Alternatively, stepping away from the *McDonnell Douglas* framework, Yelling has not shown "enough circumstantial evidence to raise a reasonable inference of intentional discrimination."   *Hamilton*, 680 F.3d at 1320.   For the foregoing reasons, there are no genuine issues of material fact and St. Vincent's is entitled to judgment as a matter of law as to Yelling's discrimination claim.

---

[15] To the extent Yelling relies on inconsistent discipline for the same conduct, her argument fails. To this end, Yelling relies on notes from the August 2015 meeting between Costanzo, Lacey, Dubose, and Haynes, during which they discussed discrepancies in her charting and her tracking report for July 26, 2015.   (Doc. 40 at 33).   Yelling notes her supervisors never mentioned this, much less imposed any discipline.   (*Id.*).   However, the August 6, 2015 meeting focused on a patient's complaints concerning the quality of care Yelling provided and her unwanted prayers. During the subsequent non-disciplinary meeting, Yelling's supervisors counseled her regarding the importance of respecting patients' requests and following orders.   By contrast, the investigation into the events of January 10, 2016, was prompted by Yelling's complaints about Stephanie Edwards, who had accused Yelling of socializing with a patients' family when Yelling was actually obtaining medical history.   The investigation of Yelling's complaint revealed Edwards was frustrated because she had provided care for Yelling's patient in room 610. Review of the charts for the patient in room 610 showed discrepancies between Yelling's charting and her tracking report.   Under these circumstances, St. Vincent's further investigation—including interviewing co-worker witnesses who corroborated the tracking data— does not show pretext.

### C.   **Retaliation**

Retaliation claims based on indirect evidence are subject to the *McDonnell Douglas* framework.  To make a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) a causal connection between the two.  *Thomas v. Cooper Lightning, Inc.,* 506 F.3d 1361, 1363 (11th Cir. 2007).  As to the second requirement, a plaintiff must show a reasonable employee would have found the employment action to be "materially adverse," meaning it would "dissuade [] a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006).  This standard covers a wider range of conduct than the standard for a discrimination claim.  *Id.* at 68-69; *Crawford*, 529 F.3d at 973-74.  As to the causal connection, a plaintiff must show his "protected activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  The causal connection may be shown by temporal proximity, but a plaintiff taking this route must show the events occurred "very close" in time.  *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Here, Yelling engaged in protected expression when she filed her first EEOC charge on November 23, 2015.  The parties agree Yelling's termination was an adverse employment action.  As to a causal connection between the two,

Yelling was terminated on February 2, 2016, a little over two months after she filed her first EEOC charge. This time period is sufficient to establish causation via temporal proximity. *See Gaddis v. Russell Corp.,* 242 F. Supp. 2d 1123, 1147 (M.D. Ala. 2003). However, as St. Vincent's argues, the events of January 10, 2016—and St. Vincent's conclusion Yelling had falsified medical records—constituted intervening conduct to defeat any inference of a causal connection created by temporal proximity. *Henderson v. FedEx Express*, 441 F. App'x 502, 504 (11th Cir. 2011) (plaintiff's falsification of time card was "a superseding cause that broke any chain of causation between" protected activity and termination) (*See* Doc. 33 at 28-29).

The other incidents on which Yelling relies—the drug test and St. Vincent's pre-termination disciplinary actions—also fail to sustain a claim for retaliation. Even if Yelling can satisfy her *prima facie* burden as to the disciplinary proceedings, Yelling contends, following her June 21, 2015 drug test and suspension—and more importantly for the purposes of retaliation, following her June 14, 2015 complaint of racial discrimination to Parrish—St. Vincent's employees began building a case against her by reporting trivial complaints to HR. (Doc. 40 at 32). In support of this theory, Yelling cites only one intra-circuit case: *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991) *superseded by statute on other grounds as recognized in Munoz v. Oceanside Resorts, Inc.,* 223

F.3d 1340, 1347 (11th Cir. 2000).  (Doc. 40 at 32).  In *Weaver*, the Eleventh Circuit recognized increased scrutiny of an employee following protected activity could constitute evidence of pretext.  *Id.* at 1524-25.  However, the plaintiff in *Weaver* presented evidence that, following his EEOC charge "at least one management employee was assigned to keep track of [the employee's] work schedule and expense reports and regularly write memos to his personnel file."  *Id.* at 1525.

Here, Yelling has presented evidence that, following her drug test suspension: (1) Dubose instructed other CDU staff on how to interact with Yelling; (2) Dubose told Laroe to "document all issues going forward"; (3) her coworkers began documenting their complaints—including some trivial complaints—regarding Yelling's job performance; and (4) Dubose forwarded coworkers complaints to HR.  This increased scrutiny does not rise to the level of "intensive monitoring" described in *Weaver*.  *See Carter v. Donahoe*, No. 13-2337, 2015 WL 2024844, at *7 (M.D. Fla. Apr. 30, 2015).  Accordingly, Yelling cannot rely on *Weaver* to show St. Vincent's proffered reasons—that she violated work rules and was disciplined accordingly—were pretextual.[16]

Likewise, Yelling's reliance on comparator evidence does not show pretext with regard to the discipline she received.  To show pretext via comparator

---

[16] The same is true to the extent Yelling may rely on *Weaver* to show pretext regarding her drug test.

evidence, Yelling must point to different treatment of employees outside her protected class to whom she is similarly situated in all material respects. *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019).  With regard to her October 8, 2015 Coaching Agreement—the first step in St. Vincent's progressive discipline process—Yelling points to the lack of discipline for a White nurse who had been fired by the patient who made the July 26, 2015 complaint against Yelling.  However, the July 26, 2015 incident was one of only four cited in Yelling's Coaching Agreement.  Yelling does not describe the circumstances that led to the patient firing the White nurse.  Accordingly, Yelling has not identified a comparator who is similarly situated in all material respects with regard to the Coaching Agreement.  Similarly, Robin Calvert is not similarly situated with respect to Yelling's November 22, 2015 Verbal Agreement—the second step in the progressive discipline process.  It is true that Calvert received a Coaching Agreement, while Yelling received a Verbal Agreement.  However, it is undisputed Calvert had not been disciplined previously, thus making St. Vincent's imposition of the first step of progressive discipline appropriate.  Accordingly, Calvert is not similarly situated to Yelling and cannot serve as a comparator.

Regarding the drug testing, this did not constitute an adverse employment action, even under the more liberal construction applied to retaliation claims. *McQueen*, 769 F. App'x 816, 824 (11th Cir. 2019).  Moreover, even if Yelling

could satisfy her *prima facie* case as to this event, she cannot show pretext. Yelling relies on the delay between the first report of apparent intoxication and her drug test three hours later. (Doc. 40 at 32). Yelling notes that, during the delay, she was allowed to continue caring for patients. Yelling contends a reasonable juror could view these facts and conclude St. Vincent's drug test was retaliatory. (*Id.*). Yelling does not describe how a reasonable juror would reach this conclusion; nor does she cite any authority to support her argument in this regard. In response, St. Vincent's relies on unrebutted evidence that, during the delay, Parrish was waiting on Costanzo to return her call and advise her how to proceed. Following Costanzo's return call, Parrish promptly went to the CDU, where she observed Yelling with her head down on her desk. While the summary judgment standard requires the court to resolve factual disputes in Yelling's favor, she has not offered any evidence to rebut St. Vincent's version of events. Rather than meeting St. Vincent's proffered reason for the drug test head-on and rebutting it, Yelling asks this court to infer pretext on murky grounds.

Finally, to the extent Yelling relies on Holly Sykes as a comparator, it is undisputed that Yelling did not notify supervisors of her suspicion—due to her dilated pupils or because she fell out of her chair on one occasion—that she was under the influence. Accordingly, Yelling has not shown St. Vincent's was aware of Sykes's supposed intoxication. *See Jones v. Gerwens*, 874 F.2d 1534, 1541-42

(11th Cir. 1989).  Additionally, Yelling was drug tested only after: (1) multiple employees reported their suspicions regarding her behavior; and (2) Haynes observed her with her head down on her desk.  Moreover, this behavior followed an occasion on which a patient's family member had complained to St. Vincent's because Yelling left her personal prescription medication in the patient's room. Yelling does not allege similar behavior or incidents with regard to Sykes. Accordingly, Sykes is not a suitable comparator because she is not similarly situated to Yelling in all material respects.

For the foregoing reasons, there are no genuine issues of material fact concerning Yelling's retaliation claim, and St. Vincent's is entitled to judgment as a matter of law.

## IV.  CONCLUSION

For all of the foregoing reasons, St. Vincent's motion for summary judgment is **GRANTED** in its entirety.  (Doc. 32).  A separate order will be entered.

**DONE** this 2nd day of December, 2020.

*Staci G. Cornelius*

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE